**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| SHAWNA COLYER and ERIC COLYER,<br><br>    *Plaintiffs,*<br><br>v.<br><br>NOVO NORDISK INC. and NOVO NORDISK A/S,<br><br>    *Defendants* | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: _____ |

Plaintiffs file this Complaint pursuant to the Direct Filing Order and are to bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiffs hereby designate the United States District Court for the District of New Jersey as Plaintiffs' designated venue ("Original Venue"). Plaintiffs make this selection based upon one (or more) of the following factors (check the appropriate box(es)):

_____ Plaintiff currently resides in _____ (City/State).

_____ Plaintiff purchased and used Defendant(s)' products in ___ (City/State).

_____ The Original Venue is a judicial district in which Defendant Novo Nordisk, Inc. resides, and Defendants are a resident of the State in which the district is located (28 USC § 1391(b)(1)).

1

 X   The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)) Defendant NOVO NORDISK INC maintains its corporate office in New Jersey, Defendants NOVO NORDISK A/S and NOVO NORDISK INC directly and/or indirectly designed, manufactured, distributed and labeled their pharmaceutical drug in New Jersey; and Defendants NOVO NORDISK A/S and NOVO NORDISK INC inadequately warned Plaintiff of the potential risks of their pharmaceutical drug from New Jersey.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, by their attorneys, Douglas & London, P.C., upon information and belief, at all times hereinafter mentioned, allege as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiffs reside, which is Florida.

2.      This Court has personal jurisdiction over Defendants, consistent with the United States Constitution and New Jersey's "long arm" statute, as Plaintiffs' claims arise out of Defendants' transaction of business and the tortious acts within the State of New Jersey, and by virtue of Defendants' substantial, continuous, and systematic contacts with the State of New Jersey unrelated to Plaintiffs' claims.

## NATURE OF THE CASE

3.      This is an action for damages suffered by Plaintiffs, as a result of Plaintiff SHAWNA COYLER's use of Defendants' Ozempic, an injectable prescription medication that is used to control blood sugar in adults with type 2 diabetes.

4.      Ozempic is also known as semaglutide. Ozempic works by targeting the body's receptors for GLP-1 (glucagon-like peptide-1) and by stimulating insulin production and reducing glucose production in the liver helping to lower blood sugar levels.

5.      Ozempic belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

6.      Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[1] However, Defendants have downplayed the severity of the gastrointestinal events caused by their GLP-1RAs, never, for example, warning of the risk of gastroparesis ("paralyzed stomach") and its sequalae.

7.      Gastroparesis is a condition that affects normal muscle movement in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. However, in a person suffering from gastroparesis, the stomach's motility is slowed down or does not work at all, preventing the stomach from emptying properly. Gastroparesis can interfere with normal digestion and cause nausea, vomiting (including vomiting of undigested food), abdominal pain, abdominal bloating, severe dehydration, a feeling of fullness after eating just a few bites, undigested food hardening and remaining in the stomach, acid reflux, changes in blood sugar levels, lack of appetite, weight loss, malnutrition, and a decreased quality of life. There is no cure for gastroparesis.[2]

---

[1] *See, e.g.*, CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601/ (visited on 10/2/24).

[2] *Gastroparesis*, Mayo Clinic (June 11, 2022), available at https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (visited on 10/2/24).

## PARTY PLAINTIFFS

8.      Plaintiff, SHAWNA COYLER, is a citizen of the United States, and is a resident of the State of Florida.

9.      Plaintiff, SHAWNA COYLER, was born on February 4, 1974.

10.     Plaintiff, ERIC COYLER, is a citizen and resident of the State of Florida.

11.     At all relevant times, Plaintiffs, SHAWNA COYLER and ERIC COYLER, were and still are lawful spouses.

12.     Plaintiff, SHAWNA COYLER, started using Ozempic in May 2023.

13.     Plaintiff SHAWNA COYLER's physician(s) ("prescribing physician(s)") prescribed the Ozempic that was used by Plaintiff SHAWNA COYLER.

14.     As a result of using Ozempic, Plaintiff SHAWNA COYLER was caused to suffer from gastroparesis and its sequelae and, as a result, she sustained severe and permanent personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

15.     As a result of using Ozempic, Plaintiff SHAWNA COYLER was caused to suffer from gastroparesis and its sequelae, which resulted in, for example, severe vomiting, stomach pain, gastrointestinal burning, visiting the emergency room due to severe vomiting, and requiring additional medications to alleviate her severe vomiting.

16.     As a result of Plaintiff SHAWNA COYLER's use of Ozempic, Plaintiff ERIC COYLER has suffered loss of consortium damages.

## PARTY DEFENDANTS

17.     Defendant Novo Nordisk Inc. is a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.  Therefore, it is a citizen of both Delaware and New Jersey for diversity of citizenship purposes.

18.    Defendant Novo Nordisk A/S is a non-governmental, publicly traded Danish corporation.  It is an entity organized and existing under the laws of Denmark with a principal place of business in Bagsværd, Denmark. Therefore, it is a citizen of Denmark for diversity of citizenship purposes.

19.    Defendant Novo Nordisk A/S and Defendant Novo Nordisk Inc. are collectively referenced as "the Novo Nordisk Defendants."

20.    Upon information and belief, the Novo Nordisk Defendants have transacted and conducted business in the State of New Jersey.

21.    Upon information and belief, the Novo Nordisk Defendants have derived substantial revenue from goods and products used in the State of New Jersey.

22.    Upon information and belief, the Novo Nordisk Defendants have expected or should have expected its acts to have consequence within the State of New Jersey and derived substantial revenue from interstate commerce within the United States, New Jersey in particular.

23.    Upon information and belief, and at all relevant times, the Novo Nordisk Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Ozempic for use by the Plaintiff SHAWNA COYLER in New Jersey.

## FACTUAL BACKGROUND

### A.    FDA's Approval of Ozempic

24.    On December 5, 2016, the Novo Nordisk Defendants announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes.

In the announcement, Defendants represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[3]

25.    On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[4]

26.    On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[5] On January 16, 2020, the FDA approved sNDA 209637/S-003.[6]

27.    On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28, 2022, the FDA approved sNDA 209637/S-009.[7]

28.    On March 28, 2022, the Novo Nordisk Defendants announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Defendants represented Ozempic as having "proven safety" and advertised that "plus it can help

---

[3] Novo Nordisk, *Novo Nordisk files for regulatory approval of once-weekly semaglutide in the US and EU for the treatment of type 2 diabetes* (Dec. 5, 2016) available at https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited on 8/24/23).
[4] FDA Approval Letter for NDA 209637 (Ozempic) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2017/209637s000ltr.pdf (last visited on 8/24/23).
[5] *Novo Nordisk files for US FDA approval of oral semaglutide for blood sugar control and cardiovascular risk reduction in adults with type 2 diabetes*, Cision PR Newswire (March 20, 2019) available at https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on 8/24/23).
[6] FDA Supplement Approval Letter for NDA 209637/A-003 (Ozempic) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited on 8/24/23).
[7] FDA Supplement Approval Letter for NDA 209637/S-009 (Ozempic) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited on 8/24/23).

many patients lose some weight."[8] As with its prior press releases, Defendants disclosed Important Safety Information and a provided link to the Medication Guide and Prescribing Information, but gastroparesis was not identified as a risk.

### B.    Defendants' Marketing and Promotion of Ozempic

29.    On December 5, 2017, Defendants announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1 RAs and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."[9]

30.    On February 5, 2018, Defendants announced that they had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]"Defendants offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."[10]

31.    Defendants promoted the safety and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

---

[8] *Novo Nordisk receives FDA approval of higher-dose Ozempic® 2 mg providing increased glycemic control for adults with type 2 diabetes*, Cision PR Newswire (March 28, 2022) available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited on 8/24/23).
[9] *Novo Nordisk Receives FDA Approval of OZEMPIC® (semaglutide) Injection For the Treatment of Adults with Type 2 Diabetes*, Cision PR Newswire (December 05, 2017), available at https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-ozempic-semaglutide-injection-for-the-treatment-of-adults-with-type-2-diabetes-300567052.html (last visited on 8/24/23).
[10] *Novo Nordisk Launches Ozempic® and Fiasp®, Expanding Treatment Options for Adults with Diabetes*, Cision PR Newswire (February 05, 2018) available at https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatment-options-for-adults-with-diabetes-300592808.html (last visited on 8/24/23).

32.     On July 30, 2018, Defendants launched their first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot wherein Defendants advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not a weight loss drug.[11]

33.     Over the next five years, Defendants spent $884,000,000 on running television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.[12]

34.     On July 6, 2023, it was reported that Defendants had spent $11,000,000 on food and travel for doctors as part of Defendants' efforts to promote Ozempic.[13]

35.     As a result of Defendants' advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.[14] In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.[15]

36.     On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[16] and currently has over 1.2 billion views.[17]

---

[11] *Ozempic TV Spot, 'Oh!'*, iSpot.tv (July 30, 2018) available at https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited on 8/24/23).

[12] Ritzau, *Novo Nordisk runs TV ads in US for multimillion-dollar sum*, MedWatch (April 26, 2023) available at https://medwatch.com/News/Pharma___Biotech/article15680727.ece (last visited on 8/24/23).

[13] Zadikian M, Khemlani A (Transcript of Video), *Novo Nordisk spent $11 million on Ozempic promotion*, Yahoo Finance (July 6, 2023) available at https://finance.yahoo.com/video/novo-nordisk-spent-11-million-155418308.html (last visited on 8/24/23).

[14] Choi A, Vu H, *Ozempic prescriptions can be easy to get online. Its popularity for weight loss is hurting those who need it most*, CNN (March 17, 2023) available at https://www.cnn.com/2023/03/17/health/ozempic-shortage-tiktok-telehealth/ (last visited on 8/24/23).

[15] Gilbert D, *Insurers clamping down on doctors who prescribe Ozempic for weight loss*, The Washington Post (June 12, 2023) available at https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited on 8/24/23).

[16] Blum D, *What is Ozempic and Why Is It Getting So Much Attention?*, The New York Times (published Nov. 22, 2022, updated July 24, 2023) available at https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited on 8/24/23).

[17] https://www.tiktok.com/tag/ozempic (last visited on 8/24/23).

37.     On June 15, 2023, a news report was published about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." And while many of those ads were found to be from online pharmacies, as of June of 2023 Defendants were still running online social-media ads for its semaglutide products despite claiming in May that it would stop running ads due to a shortage of the drug.[18]

38.     On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[19]

39.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

**C.      Defendants' Drugs Delay Gastric Emptying**

40.     Semaglutide belongs to a class of medications known as glucagon-like peptide-1 receptor agonists (GLP-1 RAs).[20]

41.     GLP-1 RAs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.[21]

42.     At all relevant times, Defendants knew or should have known from published medical literature that non-pancreatic effects of GLP-1 include slowing of gastric emptying.[22]

---

[18] Ingram D, *More than 4,000 ads for Ozempic-style drugs found running on Instagram and Facebook*, NBC News (June 15, 2023) available at https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (last visited on 8/24/23).

[19] Bain P, *Ozempic was 2023's Buzziest Drug*, AdAge (July 10, 2023) available at https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on 8/24/23).

[20] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 (last visited on 8/24/23).

[21] Hinnen D, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) Diabetes Spectr., 202–210 (August 2017) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/ (last visited on 8/24/23).

[22] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010) available at https://academic.oup.com/jcem/article/95/1/215/2835243 (last visited on 8/24/23); American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023) available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-

43.    It is well documented in the literature that GLP-1 RAs cause delayed gastric emptying. For example, a study published in October 2017 (before Defendants began marketing and selling their GLP-1 RA drugs) evaluated the effect of GLP-1 RAs on gastrointestinal tract motility and residue rates and explained that "GLP-1 suppresses gastric emptying by inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The study authors concluded that the GLP-1 RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[23]

44.    As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated that that GLP-1 slows gastric emptying.[24]

45.    Defendants knew or should have known of this risk of gastroparesis from the clinical trials.

46.    Two subjects in the Wegovy phase 3 trial pool taking semaglutide 2.4 mg reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376.

47.    The cardiovascular outcomes trials for Wegovy included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after approximately two months in the trial.

48.    On information and belief, Defendants not only knew or should have known that their GLP-1 RA drugs cause delayed gastric emptying with a risk of gastroparesis, but they may have

---

surgery (last visited on 8/24/23).
[23] Nakatani Y et al., *Effect of GLP-1 receptor agonist on gastrointestinal tract motility and residue rates as evaluated by capsule endoscopy*, 43(5) Diabetes & Metabolism, 430-37 (October 2017) available at https://www.sciencedirect.com/science/article/pii/S1262363617301076 (last visited on 8/24/23).
[24] Deane AM et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J Clinical Endo Metabolism, 225-221 (January 1, 2010) available at https://academic.oup.com/jcem/article/95/1/215/2835243 (last visited on 8/24/23).

sought out this effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric emptying]" and the study authors suggested "further exploration of peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."[25]

### D.    The Medical Literature and Clinical Trials Gave Defendants Notice of Gastroparesis Being Causally Associated with Ozempic

49.    Defendants further knew or should have known of the risk of gastroparesis from the published medical literature.

50.    In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[26]

51.    In a September 2020 article funded and reviewed by Defendants, scientists affiliated with all Defendants reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes.[27] More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus 0.5% with placebo),

---

[25] Jensterle M et al., *Semaglutide delays 4-hour gastric emptying in women with polycystic ovary syndrome and obesity*, 25(4) Diabetes Obes. Metab. 975-984 (April 2023) available at https://dom-pubs.onlinelibrary.wiley.com/doi/epdf/10.1111/dom.14944 (last visited on 8/24/23).

[26] Young CF, Moussa M, Shubrook JH, *Diabetic Gastroparesis: A Review*, Diabetes Spectr. (2020), Aug; 33(3): 290–297, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7428659/ (last visited on 8/24/23).

[27] Mosenzon O, Miller EM, & Warren ML, *Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients*, Postgraduate Medicine (2020), 132:sup2, 37-47, available at DOI:10.1080/00325481.2020.1800286 (last visited on 8/24/23).

vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of 11.5-14.5% versus placebo (5.7-7.6%) over a two-year period. The authors acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide." For patients with other comorbidities, the study warned that "patients should be made aware of the occurrence of gastrointestinal AEs with GLP-1RAs."

52.    A July 2021 article funded and reviewed by Defendants considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use.[28] When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus 8% on the placebo group), vomiting in up to 11.5% of patients (versus 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for GI-related adverse events, with some trials experiencing 100% discontinuation due to GI-related adverse events. The mean value of GR-related adverse events that led to discontinuation averaged 57.75%. Semaglutide appears to be associated with more frequent vomiting and nausea as compared to other GLP-1 RAs. The study acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy."

53.    An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the

---

[28] Smits MM & Van Raalte DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 (last visited on 8/24/23).

causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]"[29] In diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1 RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.

54.    Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved after six weeks. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."[30]

55.    Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1 RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.[31]

---

[29] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).

[30] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).

[31] Kalas MA, Galura GM, McCallum RW, *Medication-Induced Gastroparesis: A Case Report*, J Investig Med High Impact Case Rep. 2021 Jan-Dec; 9: 23247096211051919 available at

56.     On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that patients taking semaglutides and other GLP-1 RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation."[32] The ASA also warned that the risk is higher where patients on these medications have experienced nausea and vomiting.

57.     A July 25, 2023, article in Rolling Stone magazine, "*Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*", highlighted three patients who have suffered severe GI-related events, including gastroparesis, as a result of their use of GLP-1 RAs.[33] Patient 1 (female, age 37) reported incidents of vomiting multiple times per day and being unable to eat. The patient's physician diagnosed her with severe gastroparesis and concluded that her problems were caused and/or exacerbated by her use of a GLP-1 RA medication. Patient 2 (female) used Ozempic for one year and reported incidents of vomiting, including multiple times per day. The patient's physician diagnosed her with severe gastroparesis related to her Ozempic use. Patient 3 (female, age 42) experienced severe nausea both during and after she discontinued use of a GLP-1 RA. In a statement to Rolling Stone, Novo Nordisk acknowledged that "[t]he most common adverse reactions, as with all GLP-1s, are gastrointestinal related." Novo Nordisk further stated that while "GLP-1s are known to cause a delay in gastric emptying, … [s]ymptoms of delayed gastric emptying, nausea and vomiting are listed as side effects." Novo Nordisk did not claim to have warned consumers about gastroparesis.

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8529310/ (last visited on 8/24/23).

[32] American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (June 29, 2023) available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-taking-popular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery (last visited on 8/24/23).

[33] Jones CT, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023) available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (last visited on 8/24/23).

58.     On July 25, 2023, CNN reported that patients taking Ozempic have been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic."[34] Additionally, "[t]he US Food and Drug Administration said it has received reports of people on the drugs experiencing stomach paralysis[.]"

59.     Upon information and belief, at all relevant times, Defendants knew or should have known of the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

60.     Upon information and belief, Defendants ignored the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis.

61.     Defendants' failure to disclose information that they possessed regarding the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis, rendered the warnings for their medications inadequate.

**E.     Defendants Failed to Warn of the Risk of Gastroparesis From Ozempic**

62.     Gastroparesis is a disorder that slows or stops the movement of food from the stomach to the small intestine, even though there is no blockage in the stomach or intestines. Gastroparesis may also be called delayed gastric emptying.[35]

63.     Symptoms of gastroparesis include nausea, vomiting, early satiation, postprandial fullness, bloating, and upper abdominal pain, which can be refractory and challenging to manage,

---

[34] Goodman B, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed,* CNN Health (July 25, 2023) available at https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis (last visited on 8/24/23).
[35] Camilleri M, National Institute of Diabetes and Digestive and Kidney Diseases, *Gastroparesis*, available at https://www.niddk.nih.gov/health-information/digestive-diseases/gastroparesis (last visited on 8/24/23).

leading to reduced quality of life and significant health care expenditure.[36]

64.    Defendants' main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health, and weight loss, as well as "Important Safety Information" – however, Defendants do not disclose any risks causally associated with gastroparesis within the "Important Safety Information" section of their promotional website.

65.    Similarly, the Prescribing Information discloses warnings, precautions, and adverse reactions causally associated with Ozempic, but it does not disclose the risk of gastroparesis. Instead, it discloses delayed gastric emptying under the "Drug Interaction" heading and notes that Ozempic "may impact absorption of concomitantly administered oral medications." Further, under the "Mechanism of Action" section, the Prescribing Information states that "[t]he mechanism of blood glucose lowering also involves a minor delay in gastric emptying in the early postprandial phase."[37] These statements do not disclose gastroparesis as a ***risk*** of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

66.    None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risk of gastroparesis.

67.    News sources have identified the potential for serious side effects in users of Ozempic , including chronic motion sickness, leading to hospitalization.[38] For example, NBC News reported in January 2023 that some Ozempic users were discontinuing use because their symptoms were unbearable.[39] One user said that five weeks into taking the medication she found herself unable to

---

[36] Zheng T, Camilleri M, *Management of Gastroparesis*, Gastroenterology & Hepatology (Nov. 2021), Vol. 17, Issue 11, available at https://www.gastroenterologyandhepatology.net/archives/november-2021/management-of-gastroparesis/ (last visited on 8/24/23).
[37] Ozempic prescribing information, available at https://www.novo-pi.com/ozempic.pdf (last visited on 8/24/23).
[38] Min P, *Ozempic May Cause Potential Hospitalizations*, healthnews (June 26, 2023) available at https://healthnews.com/news/ozempic-may-cause-potential-hospitalizations/ (last visited on 8/24/23).
[39] Nelson EL, *These Are the 5 Most Common Ozempic Side Effects, According to Doctors*, Best Life (April 3, 2023) available at https://bestlifeonline.com/ozempic-side-effects-news/ (last visited on 8/24/23).

move off the bathroom floor because she had "vomited so much that [she] didn't have the energy to get up."[40] CNN recently reported that an Ozempic user diagnosed with gastroparesis vomits so frequently that she had to take a leave of absence from her teaching job.[41]

68.    As noted above, as early as 2020, studies conducted on the safety of semaglutide identified the prevalence of gastrointestinal adverse effects, including nausea and vomiting. One study reported that gastrointestinal complaints are the main adverse-event related cause of drug discontinuation in phase-3 trials, suggesting that these "common side effects" are severe and persistent.[42]

69.    Studies also identified a link between nausea induced by GLP-1RAs and weight loss, leading some authors to suggest that nausea and vomiting may play a role in the drug's efficacy.[43]

70.    The Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients but does not include vomiting in its "Warnings and Precautions" section, and it does not indicate a severity of risk. Gastroparesis is not mentioned at all.

71.    In January 2020, Defendants removed the "Instructions" portion from Section 17 "Patient Counseling Information" of the Ozempic label, which had instructed prescribers to "[a]dvise patients that the most common side effects of Ozempic are nausea, vomiting, diarrhea, abdominal pain and constipation." These instructions were present in the 2017 and 2019 labels.

---

[40] Bendix A, Lovelace B Jr., *What it's like to take the blockbuster drugs Ozempic and Wegovy, from severe side effects to losing 50 pounds*, NBC News (Jan. 29, 2023) available at https://www.nbcnews.com/health/health-news/ozempic-wegovy-diabetes-weight-loss-side-effects-rcna66493 (last visited on 8/24/23).

[41] Goodman B, *They took blockbuster drugs for weight loss and diabetes. Now their stomachs are paralyzed*, CNN (July 25, 2023) https://www.cnn.com/2023/07/25/health/weight-loss-diabetes-drugs-gastroparesis/index.html (last visited on 8/24/23).

[42] Mosenzon O, Miller EM, & Warren ML (2020) Oral semaglutide in patients with type 2 diabetes and cardiovascular disease, renal impairment, or other comorbidities, and in older patients, Postgraduate Medicine, 132:sup2, 37-47, DOI:10.1080/00325481.2020.1800286 (last visited on 8/24/23); *see also* Smits, MM & Van Raalte, DH (2021), *Safety of Semaglutide*, Front. Endocrinol., 07 July 2021, doi: 10.3389/fendo.2021.645563 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8294388/ (last visited on 8/24/23).

[43] *Id*.

72.    In its section on "Females and Males of Reproductive Potential," the Ozempic label advises women users to discontinue Ozempic at least 2 months before a planned pregnancy due to the long washout period for semaglutide. This demonstrates that Defendants knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastroparesis.

73.    From the date Defendants received FDA approval to market Ozempic until the present time, Defendants made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff SHAWNA COYLER's prescribing physician(s) and/or Plaintiff SHAWNA COYLER that Ozempic was causally associated with and/or could cause gastroparesis.

74.    Upon information and belief, Defendants knew or should have known of the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced above in this Complaint.

75.    Upon information and belief, Defendants ignored the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis.

76.    Defendants' failure to disclose information that they possessed regarding the causal association between the use of GLP-1 RAs and the risk of developing gastroparesis, rendered the warnings for this medication inadequate.

77.    By reason of the foregoing acts and omissions, Plaintiff SHAWNA COYLER was and still is caused to suffer from gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

## FIRST CAUSE OF ACTION
## (NEGLIGENT FAILURE TO WARN)

78.     Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

79.     Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic into the stream of commerce, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis and its sequelae.

80.     At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic that was used by Plaintiff SHAWNA COYLER.

81.     Ozempic was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Defendants.

82.     At all relevant times, and at the times Ozempic left Defendants' control, Defendants knew or should have known that Ozempic was unreasonably dangerous because they did not adequately warn of the risk of gastroparesis and its sequelae, especially when used in the form and manner as provided by Defendants.

83.     Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff SHAWNA COYLER, without adequate warnings.

84.     Despite the fact that Defendants knew or should have known that Ozempic caused

unreasonably dangerous injuries, Defendants continued to market Ozempic to prescribing physicians, including Plaintiff SHAWNA COYLER's prescribing physician(s), without adequate warnings.

85.    Defendants knew or should have known that consumers such as Plaintiff SHAWNA COYLER would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

86.    At all relevant times, given its increased safety risks, Ozempic was not fit for the ordinary purposes for which they were intended.

87.    At all relevant times, given its increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff SHAWNA COYLER.

88.    At all relevant times, Plaintiff SHAWNA COYLER was using Ozempic for the purposes and in a manner normally intended.

89.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions, as Defendants knew or should have known that the products created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

90.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastroparesis and its sequalae, as well as other severe and permanent health consequences from Ozempic, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their

product, Ozempic.

91.     The label for Ozempic was inadequate because they failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

92.     The label for Ozempic was inadequate because they failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

93.     The label for Ozempic was inadequate because it failed to warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

94.     The label for Ozempic was inadequate because it did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

95.     Communications made by Defendants to Plaintiff SHAWNA COYLER and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

96.     Communications made by Defendants to Plaintiff SHAWNA COYLER and her prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

97.     Plaintiff SHAWNA COYLER had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and her reliance upon Defendants' warnings were reasonable.

98.     Plaintiff SHAWNA COYLER's prescribing physician(s) had no way to determine

the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

99.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been warned of the increased risks of gastroparesis and its sequalae causally associated with Ozempic, then the prescribing physician(s) would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the dangers of Ozempic so as to allow Plaintiff SHAWNA COYLER to make an informed decision regarding her use of Ozempic.

100.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so as to allow Plaintiff SHAWNA COYLER to make an informed decision regarding her use of Ozempic.

101.    Had Plaintiff SHAWNA COYLER been warned of the increased risks of gastroparesis and its sequelae, which are causally associated with Ozempic, Plaintiff SHAWNA COYLER would not have used Ozempic and/or suffered from gastroparesis and its sequelae.

102.    Had Plaintiff SHAWNA COYLER been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequalae, Plaintiff SHAWNA COYLER would not have used Ozempic and/or suffered gastroparesis and its sequelae.

103.    Had Plaintiff SHAWNA COYLER been warned of the increased risks of gastroparesis and its sequelae causally associated with Ozempic, Plaintiff SHAWNA COYLER would have informed her prescribing physician(s) that Plaintiff SHAWNA COYLER did not want

to take Ozempic.

104.    Upon information and belief, if Plaintiff SHAWNA COYLER had informed her prescribing physician(s) that she did not want to take Ozempic due to the risks of gastroparesis and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff SHAWNA COYLER's prescribing physician(s) would not have prescribed Ozempic.

105.    By reason of the foregoing, Defendants have become liable to Plaintiff SHAWNA COYLER for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product, Ozempic.

106.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to Plaintiff SHAWNA COYLER in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff SHAWNA COYLER.

107.    Defendants' inadequate warnings for Ozempic were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

108.    Said inadequate warnings for Defendants' drug Ozempic were a substantial factor in causing Plaintiff SHAWNA COYLER's injuries.

109.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries, including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

110.    As a result of the foregoing acts and omissions, Plaintiff SHAWNA COYLER did incur medical, health, incidental, and related expenses, and requires and/or will require more health

care and services. Plaintiff SHAWNA COYLER is informed and believes and further alleges that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and services.

111.    By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## SECOND CAUSE OF ACTION
## (STRICT PRODUCT LIABILITY FAILURE TO WARN)

112.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

113.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic into the stream of commerce, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis and its sequelae.

114.    At all times mentioned herein, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic that was used by Plaintiff SHAWNA COYLER.

115.    Ozempic was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Defendants.

116.    At all relevant times, and at the times Ozempic left Defendants' control, Defendants knew or should have known that Ozempic was unreasonably dangerous because they did not adequately warn of the risk of gastroparesis and its sequelae, especially when used in the form and

manner as provided by Defendants.

117.    Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff SHAWNA COYLER, without adequate warnings.

118.    Despite the fact that Defendants knew or should have known that Ozempic caused unreasonably dangerous injuries, Defendants continued to market Ozempic to prescribing physicians, including Plaintiff SHAWNA COYLER's prescribing physician(s), without adequate warnings.

119.    Defendants knew or should have known that consumers such as Plaintiff SHAWNA COYLER would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

120.    At all relevant times, given their increased safety risks, Ozempic was not fit for the ordinary purposes for which they were intended.

121.    At all relevant times, given their increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff SHAWNA COYLER.

122.    At all relevant times, Plaintiff SHAWNA COYLER was using Ozempic for the purposes and in a manner normally intended.

123.    The Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the products created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendants failed to adequately warn of said risk.

124.    The Ozempic designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including gastroparesis and its sequalae, as well as other severe and permanent health consequences from Ozempic, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their product, Ozempic.

125.    The label for Ozempic was inadequate because they failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

126.    The label for Ozempic was inadequate because they failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

127.    The label for Ozempic was inadequate because they failed to warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

128.    The label for Ozempic was inadequate because they did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

129.    Communications made by Defendants to Plaintiff SHAWNA COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

130.    Communications made by Defendants to Plaintiff SHAWNA COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately

tested for safety risks, including gastroparesis and its sequelae.

131.    Plaintiff SHAWNA COYLER had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and her reliance upon Defendants' warnings was reasonable.

132.    Plaintiff SHAWNA COYLER's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

133.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been warned of the increased risks of gastroparesis and its sequalae causally associated with Ozempic, then the prescribing physician(s) would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the dangers of Ozempic so as to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

134.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, the prescribing physician would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so as to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

135.    Had Plaintiff SHAWNA COYLER been warned of the increased risks of gastroparesis and its sequelae, which are causally associated with Ozempic, she would not have used Ozempic and/or suffered from gastroparesis and its sequelae.

136.    Had Plaintiff SHAWNA COYLER been warned that Ozempic had not been

sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequalae, she would not have used Ozempic and/or suffered gastroparesis and its sequelae.

137.    Had Plaintiff SHAWNA COYLER been warned of the increased risks of gastroparesis and its sequelae causally associated with Ozempic, Plaintiff SHAWNA COYLER would have informed her prescribing physician(s) that Plaintiff SHAWNA COYLER did not want to take Ozempic.

138.    Upon information and belief, if Plaintiff SHAWNA COYLER had informed her prescribing physician(s) that Plaintiff SHAWNA COYLER did not want to take Ozempic due to the risks of gastroparesis and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff SHAWNA COYLER's prescribing physician(s) would not have prescribed Ozempic.

139.    By reason of the foregoing, Defendants have become liable to Plaintiff SHAWNA COYLER for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous product, Ozempic.

140.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to Plaintiff SHAWNA COYLER, in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff SHAWNA COYLER.

141.    Defendants' inadequate warnings for Ozempic were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

142.    Said inadequate warning for Defendants' drug Ozempic was a substantial factor in causing Plaintiff SHAWNA COYLER's injuries.

143.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries, including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and

lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

144.    As a result of the foregoing acts and omissions, Plaintiff SHAWNA COYLER did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff SHAWNA COYLER is informed and believes and further alleges that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and services.

145.    By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

### THIRD CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY)

146.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

147.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic, which were used by Plaintiff SHAWNA COYLER as hereinabove described.

148.    At all relevant times, Defendants expressly warranted to Plaintiff SHAWNA COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s) that Ozempic were safe and effective for treatment of adults with type 2 diabetes and assured them that they did not carry increased risks of gastrointestinal complications, including, but not limited to, gastroparesis.

149.    The aforementioned express warranties were made to Plaintiff SHAWNA

COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s) by way of Ozempic's label, website, advertisements, promotional materials, and through other statements.

150. As a result of Defendants' express warranties, Plaintiff SHAWNA COYLER's prescribing physician(s) was induced to prescribe Ozempic to Plaintiff SHAWNA COYLER, and Plaintiff SHAWNA COYLER was induced to use Ozempic.

151. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff SHAWNA COYLER, would use and/or consume Ozempic based upon their express warranties.

152. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff SHAWNA COYLER's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic based upon their express warranties.

153. At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of the increased risk of gastroparesis and its sequelae, especially when the drugs were used in the form and manner as provided by Defendants.

154. At all relevant times, Defendants knew or should have known that Ozempic had not been sufficiently and/or adequately tested for safety.

155. The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by the ordinary user, such as Plaintiff SHAWNA COYLER, with the ordinary knowledge common to the public as to the drug's characteristics.

156. The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by Plaintiff SHAWNA COYLER's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

157. At the time Ozempic left Defendants' control, Ozempic did not conform to Defendants' express warranties because Ozempic were not safe and effective for treatment of

adults with type 2 diabetes, in that the drugs were causally associated with increased risks of gastroparesis and its sequelae.

158.    The express warranties made by Defendants regarding the safety of Ozempic were made with the intent to induce Plaintiff SHAWNA COYLER to use the products and/or her prescribing physician(s) to prescribe these products.

159.    Defendants knew and/or should have known that by making the express warranties to Plaintiff SHAWNA COYLER and/or Plaintiff SHAWNA COYLER's prescribing physician(s), it would be the natural tendency of Plaintiff SHAWNA COYLER to use Ozempic and/or the natural tendency of her prescribing physician(s) to prescribe Ozempic.

160.    Plaintiff SHAWNA COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s), as well as members of the medical community, relied on the express warranties of Defendants identified herein.

161.    Had Defendants not made these express warranties, Plaintiff SHAWNA COYLER would not have used Ozempic and/or, upon information and belief, Plaintiff SHAWNA COYLER's prescribing physician(s) would have altered their prescribing practices and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the dangers of Ozempic so as to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

162.    Had Plaintiff SHAWNA COYLER been warned of the increased risk of gastroparesis causally associated with Ozempic, she would not have used Ozempic and/or suffered from gastroparesis and its sequelae.

163.    Had Plaintiff SHAWNA COYLER been warned that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis, she would not have used Ozempic and/or suffered gastroparesis and its sequelae.

164. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff, SHAWNA COYLER.

165. Defendants' breaches of express warranty were a substantial factor in causing Plaintiff SHAWNA COYLER's injuries.

166. Plaintiff SHAWNA COYLER's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff SHAWNA COYLER.

167. As a direct and proximate result of the foregoing breaches, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

168. By reason of the foregoing, Plaintiff SHAWNA COYLER has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff SHAWNA COYLER's use of Defendants' drug, Ozempic.

169. As a result of the foregoing acts and omissions, Plaintiff SHAWNA COYLER requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff SHAWNA COYLER is informed and believes and further alleges that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and services.

170. By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**FOURTH CAUSE OF ACTION**
**(BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)**

171.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

172.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic drug used by Plaintiff SHAWNA COYLER.

173.    Ozempic were expected to and did reach the usual consumers, handlers, and persons encountering said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

174.    At all relevant times, Defendants impliedly warranted to Plaintiff SHAWNA COYLER, Plaintiff SHAWNA COYLER's prescribing physician(s), and the medical community that Ozempic was of merchantable quality and safe and fit for their ordinary purposes.

175.    At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of the increased risk of gastroparesis and its sequelae, especially when the drugs were used in the form and manner as provided by Defendants.

176.    At all relevant times, Defendants knew or should have known that Ozempic had not been sufficiently and/or adequately tested for safety.

177.    At the time Ozempic left Defendants' control, Ozempic did not confirm to Defendants' implied warranty and were unfit for their ordinary purposes because Defendants failed to provide adequate warnings of the drugs' causal association with increased risk of gastroparesis and its sequelae.

178.    At all relevant times, Defendants reasonably anticipated and expected that

prescribing physician(s), such as Plaintiff SHAWNA COYLER's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic for patients with type 2 diabetes.

179.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff SHAWNA COYLER would use and/or consume Ozempic for their ordinary purposes.

180.    Despite the fact that Defendants knew or should have known that Ozempic causes unreasonably dangerous injuries, such as gastroparesis and its sequelae, Defendants continued to market, distribute, and/or sell Ozempic to consumers, including Plaintiff SHAWNA COYLER without adequate warnings.

181.    The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by the ordinary user, such as Plaintiff SHAWNA COYLER with the ordinary knowledge common to the public as to the drugs' characteristics.

182.    The unreasonably dangerous characteristics of Ozempic were beyond that which would be contemplated by Plaintiff SHAWNA COYLER's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

183.    Plaintiff SHAWNA COYLER reasonably relied on Defendants' implied warranty of merchantability relating to Ozempic's safety and efficacy.

184.    Plaintiff SHAWNA COYLER reasonably relied upon the skill and judgment of Defendants as to whether Ozempic were of merchantable quality and safe and fit for their intended use.

185.    Upon information and belief Plaintiff SHAWNA COYLER's prescribing physician(s) relied on Defendants' implied warranty of merchantability and fitness for the ordinary use and purpose relating to Ozempic.

186.    Upon information and belief Plaintiff SHAWNA COYLER's prescribing

physician(s), reasonably relied upon the skill and judgment of Defendants as to whether Ozempic were of merchantable quality and safe and fit for its intended use.

187.    Had Defendants not made these implied warranties, Plaintiff SHAWNA COYLER would not have used Ozempic and/or, upon information and belief, Plaintiff SHAWNA COYLER's prescribing physician(s) would not have prescribed Ozempic, and/or would have altered their prescribing practices and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the dangers of Ozempic to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

188.    Defendants herein breached the aforesaid implied warranty of merchantability because the drug Ozempic was not fit for the drugs' intended purposes.

189.    Defendants' breaches of implied warranty of merchantability were a substantial factor in causing Plaintiff SHAWNA COYLER's injuries.

190.    As a direct and proximate result of the foregoing breaches, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

191.    As a result of the foregoing acts and omissions Plaintiff SHAWNA COYLER requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff SHAWNA COYLER is informed and believes and further alleges that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and services.

192.     By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## FIFTH CAUSE OF ACTION
## (FRAUDULENT CONCEALMENT)

193.     Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

194.     At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic, which was used by Plaintiff SHAWNA COYLER as hereinabove described.

195.     At all relevant times, Defendants knew or should have known that Ozempic had not been adequately and/or sufficiently tested for safety.

196.     At all relevant times, Defendants knew or should have known that Ozempic was unreasonably dangerous because of the increased risk of gastroparesis and its sequelae, especially when the drugs were used in the form and manner as provided by Defendants.

197.     Defendants had a duty to disclose material information about Ozempic to Plaintiff SHAWNA COYLER and her prescribing physician(s), namely that Ozempic is causally associated with increased risk of gastroparesis and its sequelae, because Defendants have superior knowledge of the drugs and their dangerous side effects, this material information is not readily available to Plaintiff SHAWNA COYLER or Plaintiff SHAWNA COYLER's prescribing physician(s) by reasonable inquiry, and Defendants knew or should have known that Plaintiff SHAWNA COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s) would act on the basis of mistaken knowledge.

198.     Nonetheless, Defendants consciously and deliberately withheld and concealed from

36

Plaintiff SHAWNA COYLER's prescribing physician(s), Plaintiff SHAWNA COYLER, the medical and healthcare community, and the general public this material information.

199.    Although the Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients, they do not mention gastroparesis as a risk of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

200.    Defendants' promotional websites for Ozempic similarly do not disclose that Ozempic are causally associated with increased risk of gastroparesis.

201.    Defendants' omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff SHAWNA COYLER's prescribing physician(s), and adult type 2 diabetes patients, such as Plaintiff SHAWNA COYLER to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic for treatment of type 2 diabetes.

202.    Defendants knew or should have known that Plaintiff SHAWNA COYLER's prescribing physician(s) would prescribe, and Plaintiff SHAWNA COYLER would use Ozempic without the awareness of the risks of serious side effects, including gastroparesis and its sequelae.

203.    Defendants knew that Plaintiff SHAWNA COYLER and her prescribing physicians (s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Ozempic, as set forth herein.

204.    Upon information and belief, Plaintiff SHAWNA COYLER's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Ozempic.

205.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been warned of the increased risk of gastroparesis causally associated with Ozempic,

they would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate information regarding the increased risk of gastroparesis causally associated with Ozempic to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

206.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

207.    Plaintiff SHAWNA COYLER justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume.

208.    Had Plaintiff SHAWNA COYLER been informed of the increased risks causally associated with Ozempic, Plaintiff SHAWNA COYLER would not have used Ozempic and/or suffered gastroparesis and its sequelae.

209.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff SHAWNA COYLER's injuries.

210.    As a direct and proximate result of the above stated omissions as described herein, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

211.    As a result of the foregoing acts and omissions the Plaintiff SHAWNA COYLER

requires and/or will require more health care and services and did incur medical, health, incidental,

and related expenses. Plaintiff SHAWNA COYLER is informed and believes and further alleges

that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and

services.

212.    By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the

sum of TEN MILLION DOLLARS ($10,000,000.00).

## SIXTH CAUSE OF ACTION
## (FRAUDULENT MISREPRESENTATION)

213.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint

contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more

fully set forth herein.

214.    At all relevant times, Defendants designed, researched, manufactured, tested,

advertised, promoted, marketed, sold, and distributed Ozempic, which was used by Plaintiff

SHAWNA COYLER as hereinabove described.

215.    At all relevant times, Defendants knew or should have known that Ozempic had

not been adequately and/or sufficiently tested for safety.

216.    At all relevant times, Defendants knew or should have known of the serious side

effects of Ozempic, including gastroparesis and its sequelae.

217.    At all relevant times, Defendants knew or should have known that Ozempic was

not a safe and effective drug for treatment of adults' type 2 diabetes, given their increased risk of

gastroparesis.

218.    Nonetheless, Defendants made material misrepresentations to Plaintiff SHAWNA

COYLER, Plaintiff SHAWNA COYLER's prescribing physician(s), the medical and healthcare

community at large, and the general public regarding the safety and/or efficacy of Ozempic.

219.    Defendants represented affirmatively and by omission on television advertisements and on the label of Ozempic that Ozempic was safe and effective were safe and effective drugs for treatment of adults type 2 diabetes, despite being aware of increased risks of gastroparesis and its sequelae causally associated with using Ozempic.

220.    Defendants were aware or should have been aware that their representations were false or misleading and knew that they were concealing and/or omitting material information from Plaintiff SHAWNA COYLER, Plaintiff SHAWNA COYLER's prescribing physician(s), the medical and healthcare community, and the general public.

221.    Defendants' misrepresentations of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff SHAWNA COYLER's prescribing physician(s), and adult type 2 diabetes patients, such as Plaintiff SHAWNA COYLER, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic for treatment of type 2 diabetes.

222.    Upon information and belief that Plaintiff SHAWNA COYLER's prescribing physician(s) had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Ozempic, and reasonably relied on false and/or misleading facts and information disseminated by Defendant, which included Defendants' omissions of material facts in which Plaintiff SHAWNA COYLER's prescribing physician(s) had no way to know were omitted.

223.    Upon information and belief that Plaintiff SHAWNA COYLER's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Ozempic to Plaintiff SHAWNA COYLER.

224.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been informed of the increased risk of gastroparesis causally associated with Ozempic, Plaintiff SHAWNA COYLER's prescribing physician(s) would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate information regarding safety of Ozempic to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

225.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so that Plaintiff SHAWNA COYLER can make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

226.    Plaintiff SHAWNA COYLER had no way to determine the truth behind Defendants' false and/or misleading statements, concealments and omissions surrounding Ozempic, and reasonably relied on false and/or misleading facts and information disseminated by Defendant, which included Defendants' omissions of material facts in which Plaintiff SHAWNA COYLER had no way to know were omitted.

227.    Plaintiff SHAWNA COYLER justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to accept, purchase and/or consume Ozempic.

228.    Had Plaintiff SHAWNA COYLER been told of the increased risk of gastroparesis and its sequelae causally associated with Ozempic, Plaintiff SHAWNA COYLER would not have used Ozempic and/or suffered gastroparesis and its sequelae.

229.    Had Plaintiff SHAWNA COYLER been told of the lack of sufficient and/or

appropriate testing of Ozempic for safety risks, including gastroparesis and its sequelae, Plaintiff SHAWNA COYLER would not have used Ozempic and/or suffered gastroparesis and its sequelae.

230.    As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

231.    As a result of the foregoing acts and omissions the Plaintiff SHAWNA COYLER requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff SHAWNA COYLER is informed and believes and further alleges that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and services.

232.    By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## SEVENTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

233.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

234.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic, which were used by Plaintiff SHAWNA COYLER as hereinabove described.

235.    At all relevant times, Defendants knew or should have known that Ozempic had not been adequately and/or sufficiently tested for safety.

236.    At all relevant times, Defendants knew or should have known of the serious side effects of Ozempic, including gastroparesis and its sequelae.

237.    Defendants had a duty to disclose material information about Ozempic to Plaintiff SHAWNA COYLER and Plaintiff SHAWNA COYLER's prescribing physician(s) that Ozempic is causally associated with increased risk of gastroparesis and its sequelae, because Defendants held a special expertise with respect to Ozempic, Plaintiff SHAWNA COYLER, as a user of Ozempic, had a special relationship of trust with Defendant, and Defendants knew that their statements regarding the risks causally associated with Ozempic would be relied on by Ozempic users.

238.    Nonetheless, Defendants made material misrepresentations and omissions and/or concealments to Plaintiff SHAWNA COYLER, Plaintiff SHAWNA COYLER's prescribing physician[s], the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Ozempic.

239.    Defendants represented affirmatively and by omission on television advertisements and on the label of Ozempic that Ozempic was safe and effective drugs for treatment of adults with type 2 diabetes, despite being aware of the increased risks of gastroparesis and its sequelae causally associated with using Ozempic.

240.    Defendants were aware or should have been aware that their representations were false or misleading and/or knew that Defendants were concealing and/or omitting material information from Plaintiff SHAWNA COYLER, Plaintiff SHAWNA COYLER's prescribing physician[s], the medical and healthcare community, and the general public.

241.    Defendants knew that Plaintiff SHAWNA COYLER and Plaintiff SHAWNA

COYLER's prescribing physicians (s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding Ozempic, as set forth herein.

242.    Upon information and belief that Plaintiff SHAWNA COYLER's prescribing physician(s) justifiably relied on Defendants' material misrepresentations, including the omissions contained therein, when making the decision to prescribe Ozempic to Plaintiff SHAWNA COYLER.

243.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been warned of the increased risk of gastroparesis and its sequelae causally associated with Ozempic, they would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate information regarding safety of Ozempic so as to allow Plaintiff SHAWNA COYLER to make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

244.    Upon information and belief, had Plaintiff SHAWNA COYLER's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and/or would have provided Plaintiff SHAWNA COYLER with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic so that Plaintiff SHAWNA COYLER can make an informed decision regarding Plaintiff SHAWNA COYLER's use of Ozempic.

245.    Plaintiff SHAWNA COYLER reasonably relied on the false and/or misleading facts and information disseminated by Defendant, which included Defendants' omissions of material facts in which Plaintiff SHAWNA COYLER had no way to know were omitted.

246.    Had Plaintiff SHAWNA COYLER been told of the increased risk of gastroparesis and its sequelae causally associated with Ozempic, Plaintiff SHAWNA COYLER would not have used Ozempic and/or suffered gastroparesis and its sequelae.

247.    Defendants' misrepresentations and omissions of material facts amount to willful, wanton, and/or reckless conduct.

248.    As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff SHAWNA COYLER was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

249.    As a result of the foregoing acts and omissions the Plaintiff SHAWNA COYLER requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff SHAWNA COYLER is informed and believes and further alleges that Plaintiff SHAWNA COYLER will require future medical and/or hospital care, attention, and services.

250.    By reason of the foregoing, Plaintiffs have been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## EIGHTH CAUSE OF ACTION
## (LOSS OF CONSORTIUM)

251.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

252.    Plaintiff ERIC COYLER was and is the lawful spouse of SHAWNA COYLER and, as such, was and is entitled to the comfort, enjoyment, society and services of his spouse.

253.    As a direct and proximate result of the foregoing, Plaintiff ERIC COYLER was deprived of the comfort and enjoyment of the services and society of his spouse, SHAWNA COYLER, has suffered and will continue to suffer economic loss, and has otherwise been emotionally and economically injured.  Plaintiff ERIC COYLER's injuries and damages are permanent and will continue into the future. The Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.

254.    By reason of the foregoing, each Plaintiff has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages to Plaintiffs for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiffs, health care costs, medical monitoring, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendant, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

3.    Awarding Plaintiffs reasonable attorneys' fees;

4.    Awarding Plaintiffs the costs of these proceedings; and

5.    Such other and further relief as this Court deems just and proper.

Dated: July 22, 2025                    By:    */s/ Virginia E. Anello*
                                               Virginia E. Anello (VA-8197)
                                               Douglas & London, P.C.
                                               935 Gravier St, Suite 2120
                                               New Orleans, LA 70112
                                               Ph: (212) 566-7500
                                               Fax: (212) 566-7501
                                               Email: vanello@douglasandlondon.com
                                               *Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Dated: July 22, 2025

By:  */s/ Virginia E. Anello*
Virginia E. Anello (VA-8197)
Douglas & London, P.C.
935 Gravier St, Suite 2120
New Orleans, LA 70112
Ph: (212) 566-7500
Fax: (212) 566-7501
Email: vanello@douglasandlondon.com
*Attorneys for Plaintiff*